IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Frank Palestro, | ) | C/A No.: 1:16-707-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be reversed
and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On February 27, 2013, Plaintiff protectively filed an application for DIB in which
he alleged his disability began on February 6, 2013. Tr. at 74 and 157–58. His application
was denied initially and upon reconsideration. Tr. at 85–88. On February 20 and May 7,

2014, Plaintiff had hearings before Administrative Law Judge ("ALJ") Dennis G. Katz. Tr. at 27–43 and 44–60 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 17, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 4, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 50 years old at the time of the hearings. Tr. at 21. He completed high school. *Id.* His past relevant work ("PRW") was as a police officer and a security guard. Tr. at 49. He alleges he has been unable to work since February 6, 2013. Tr. at 30.

2.    Medical History

a.    Evidence Before ALJ

Marc Samolsky, M.D. ("Dr. Samolsky"), administered epidural steroid injections to Plaintiff's lumbar spine on May 4 and June 1, 2011. Tr. at 369 and 370. On June 3, 2011, Plaintiff reported he was injured on May 14, while attempting to break up a fight. Tr. at 318. He complained of pain that radiated down his left leg, as well as tingling and partial numbness in his left first, second, and third toes. *Id.* Dr. Samolsky refilled Plaintiff's prescription for Hydrocodone and prescribed 750 milligrams of Relafen. *Id.* He cleared Plaintiff to return to work on June 5 and instructed him to follow up by telephone after consulting with a spine surgeon. *Id.*

Plaintiff presented to Seth L. Neubardt, M.D. ("Dr. Neubardt"), on June 13, 2011. Tr. at 368. Dr. Neubardt observed Plaintiff to ambulate with a normal gait; to have no scoliosis or kyphotic deformity; to be non-tender to palpation; to have no paravertebral spasm; to have range of motion ("ROM") reduced by 25%; to have intact motor, sensory, and reflex examinations; to be able to perform heel and toe walks; and to have a negative straight-leg raising ("SLR") test. *Id.* He recommended Plaintiff obtain a new MRI scan and continue receiving pain management treatment. *Id.*

On June 20, 2011, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine showed lumbosacral spondylosis with multilevel disc disease and neuroforaminal narrowing, as well as facet hypertrophy at L4-5 and L5-S1, with narrowing of the lateral recesses bilaterally at these levels. Tr. at 271–72.

Plaintiff presented to John M. Olsewski, M.D. ("Dr. Olsewski"), for a consultation regarding pain in his low back and pain and paresthesias in his left lower extremity on June 24, 2011. Tr. at 277. He endorsed a two-year history of low back pain, but indicated his pain was exacerbated on May 14, 2011, when he restrained two prisoners who were fighting. *Id.* He indicated he had received epidural steroid injections that had not improved his symptoms. *Id.* Dr. Olsewski indicated Plaintiff had normal gait and station; positive SLR test at 40 degrees in the sitting and supine positions on the left; 5/5 strength in the bilateral upper and lower extremities; and no pain with ROM testing. Tr. at 277–78. He reviewed Plaintiff's imaging studies and assessed two-level lumbar stenosis, spondylosis, and possible instability. Tr. at 278. He referred Plaintiff to physical therapy

3

and recommended a neurology consultation to determine the level of nerve-root involvement in his lower extremity. *Id.*

Plaintiff complained of continued pain that radiated from his back through his legs on June 29, 2011. Tr. at 365. He indicated his pain radiated to his lateral calf and to the sole of his foot and that he experienced occasional numbness, tingling, and weakness. *Id.* Dr. Neubardt noted that Plaintiff was out of work because of his pain. *Id.* He indicated there were no changes between the June 20, 2011 MRI and another MRI performed on May 3, 2010, and stated he would not recommend surgery. *Id.*

On July 22, 2011, Jerry G. Kaplan, M.D. ("Dr. Kaplan"), conducted electromyography ("EMG") and nerve conduction studies of Plaintiff's bilateral legs. Tr. at 395. Plaintiff reported his symptoms were worsened by standing and walking, but noted that "sitting for any period of time" was most likely to exacerbate his symptoms. Tr. at 396. The testing was strongly suggestive of lumbar radiculopathy and revealed L5 and S1 denervation that was worse on the left than on the right. Tr. at 395 and 397. Dr. Kaplan stated in a letter that Plaintiff's radiculopathy was exacerbated by sitting. Tr. at 394. He indicated Plaintiff was unable to return to work earlier than August 26, 2011. *Id.*

On August 18, 2011, Dr. Olsewski stated Plaintiff had evidence of spinal stenosis with instability at L4-5 and L5-S1 and had not responded to non-surgical measures. Tr. at 274. He explained to Plaintiff that surgery was necessary to prevent further neurological deterioration and that there was a 70–80% chance his leg pain would improve and a 70% chance his back pain would improve. *Id.* He discussed with Plaintiff the risks of surgery and recommended Plaintiff engage in acute postoperative rehabilitation. *Id.*

4

On August 25, 2011, Dr. Olsewski noted that Plaintiff had received medical and cardiology clearance for surgery and that Dr. Kaplan had found evidence of denervation of both the L5 and S1 nerve roots bilaterally. Tr. at 268.

On September 13, 2011, Dr. Olsewski performed decompression and posterior spinal fusion surgery at Plaintiff's L4-5 and L5-S1 levels. Tr. at 263–65.

Plaintiff followed up with James McGaughan, RPA-C ("Mr. McGaughan"), in Dr. Olsewski's office for a wound check on September 28, 2011. Tr. at 291. Mr. McGaughan replaced Plaintiff's bandages and positioned an external bone stimulator. *Id.* He referred Plaintiff to Mark R. Weigle, M.D. ("Dr. Weigle"), for outpatient physical therapy and instructed him to follow up in two weeks. *Id.*

On October 26, 2011, Dr. Olsewski noted that Plaintiff's surgical wound was clean and dry and that Plaintiff was engaging in physical therapy on his own because he could not afford his copayments. Tr. at 289. He indicated Plaintiff's paresthesias had improved and that his motor strength had nearly returned. *Id.* He stated Plaintiff was capable of driving, swimming, and bathing in a tub. *Id.*

Dr. Olsewski noted Plaintiff was making slow, but steady improvement on December 7, 2011. Tr. at 287. He indicated Plaintiff continued to complain of radicular symptoms, but that x-rays showed consolidation of his fusion. *Id.* He stated Plaintiff was not capable of returning to his previous level of occupation at the time of the evaluation. *Id.* Dr. Olsewski indicated Plaintiff was incapable of traveling to and from job duties, bending, twisting, lifting, changing clothes, putting on shoes and socks, or dressing himself. Tr. at 298.

5

On January 25, 2012, Mr. McGaughan indicated Plaintiff's back pain was greatly improved following surgery, but that he had had experienced some muscular discomfort after returning to his job as a police officer. Tr. at 284. Mr. McGaughan observed Plaintiff to have 5/5 motor strength in his upper and lower extremities; 1+ deep tendon reflexes ("DTRs"); a well-healed surgical scar; negative SLR test; negative Patrick and Fabere maneuvers; and negative Hoffman, Babinski, and clonus signs. *Id.* X-rays of Plaintiff's lumbar spine showed his instrumentation to be in excellent position and his bone graft to be consolidating. *Id.* Mr. McGaughan and Dr. Olsewski recommended Plaintiff continue to use a bone stimulator and begin active ROM exercises. Tr. at 285.

Plaintiff reported back pain and a shooting pain down his legs on April 4, 2012. Tr. at 279. He stated his pain had improved since his surgery, but that it continued to be exacerbated by his work as a police officer. *Id.* Mr. McGaughan observed Plaintiff's back pain to be reproduced by hyperextension on forward flexion. *Id.* He indicated Plaintiff had 5/5 motor strength; 1+ DTRs; negative SLR test; negative Patrick and Fabere maneuvers; and a well-healed surgical scar. *Id.* He recommended Plaintiff continue physical therapy and obtain a prescription for Lyrica from Dr. Samolsky. Tr. at 280.

On July 12, 2012, Plaintiff reported some improvement in his back and leg pain following surgery, but indicated his pain was exacerbated by standing for long hours in his job as a police officer. Tr. at 275. Mr. McGaughan observed Plaintiff to have 5/5 motor strength in his lower extremities; 1+ DTRs; negative SLR test in the seated and supine positions; negative Patrick and Fabere maneuvers; a well-healed surgical scar; and negative Hoffman, Babinski, and clonus signs. Tr. at 275. X-rays showed instrumentation

from L4 to S1 that was in excellent position with a solid fusion. *Id.* Mr. McGaughan and Dr. Olsewski signed a statement that indicated Plaintiff "should still be considered 100% disabled from his previous level occupation as a police officer." Tr. at 276.

Dr. Olsewski completed a Workers' Compensation summary on July 11, 2012. Tr. at 269–70. He stated Plaintiff was forced to return to work against his medical advice just four months after his surgery. Tr. at 269. He indicated this contributed to the slowing of Plaintiff's healing process and that Plaintiff "was not even close to having completely fused" when he returned to work. *Id.* He stated Plaintiff was "incapable of returning to full-time police officer duties"; was "incapable of returning to police officer duties of any capacity, including light, limited, or restricted duty"; and was "incapable of wearing a gun belt." *Id.* He further indicated as follows:

> As in my initial consultation note of June 24, 2011, the patient is unable to return to full time police officer duties, and I do not feel that he is safe to either protect himself nor the public in his present state. He is 100% impaired from any police officer duties including light, limited, or restricted duty. This condition will be permanent, he has had a 2 level lumbar arthrodesis.

Tr. at 270.

On July 23, 2012, Plaintiff continued to report severe back spasms and pain radiating to his lower extremities. Tr. at 416–17. He complained of persistent radicular symptoms and difficulty sitting or standing for long periods of time. Tr. at 417. Dr. Weigle observed Plaintiff to have normal and symmetric reflexes; diminished sensation below the knee on the left side and in the right anterior thigh; difficulty with lumbar ROM; palpable spasms in the upper to mid-lumbar paraspinals; limited ROM with 15–20

degrees of extension and 60–70 degrees of flexion; and good motor power throughout his lower extremities. *Id.* He indicated Plaintiff was unable to perform full duty as a police officer and may be unable to tolerate limited or restricted duty. Tr. at 418. He stated Plaintiff was likely to have problems with riding on a train and sitting for prolonged periods. *Id.*

On August 1, 2012, Dr. Olsewski stated nonsurgical measures had proven ineffective to reduce Plaintiff's back pain and symptoms and that surgery had been recommended. Tr. at 273. He indicated the June 20, 2011 MRI report did not comment on the retrolisthesis at L4 on L5 and spondylolisthesis of L5 on S1, but that it was not uncommon for an MRI to fail to detect such findings. *Id.* He sent a letter to New York City Police Commissioner Raymond W. Kelly on September 8, 2012, regarding Plaintiff's condition, medical care, and prognosis. Tr. at 316. Dr. Olsewski explained that Plaintiff had undergone surgery for lumbar fusion and decompression of three nerve-roots bilaterally. *Id.*

On September 26, 2012, Plaintiff complained of lower extremity pain that was worse on the left than the right; numbness in the bottom of his foot and the top of his toes; and increased pain in his back and lower extremities while working. Tr. at 411. He also endorsed increased numbness and pain on rainy days. *Id.* Dr. Weigle observed Plaintiff to have a depressed ankle jerk on the left; decreased sensation more in the left than the right L5-S1 distribution; and limited lumbar ROM. *Id.* He diagnosed polyradiculpoathy involving the left S1 and bilateral L5 nerve roots without electrodiagnostic evidence of polyneuropathy. Tr. at 412.

Plaintiff followed up with Dr. Weigle for a reexamination on October 17, 2012. Tr. at 408. He complained of severe pain that radiated to his lower extremities and was worse on the left than the right. *Id.* He indicated his pain was worsened by standing on his feet to work. *Id.* He stated he was unable to take Gabapentin while working because it affected his ability to think. *Id.* Dr. Weigle indicated Plaintiff's EMG results were essentially unchanged from the prior testing. *Id.* He observed Plaintiff to have forward flexion limited to 30 degrees; extension limited to 15–20 degrees; tenderness in his bilateral lumbar paraspinal musculature; pain with internal rotation of his hips; positive SLR test on the left; and decreased sensation in the L5 and S1 distribution on the dorsum of his bilateral feet and in the lateral aspect of his calf. Tr. at 409. He indicated Plaintiff had deficits in mobility and activities of daily living and persistent polyradiculopathy in the left S1 and bilateral L5 nerve roots with slight improvement in amplitude, but prolongation of the bilateral tibial H reflexes. *Id.* He advised Plaintiff to stop work because of his inability to tolerate prolonged standing or ambulation; recommended Plaintiff resume use of Gabapentin, if he was not working[1]; continue home exercises; continue using a Transcutaneous Electrical Nerve Stimulation ("TENS") unit; reduce his stress; and follow up with Dr. Olsewski. *Id.*

Plaintiff reported doing well from a neurological standpoint on December 5, 2012. Tr. at 267. Dr. Olsewski indicated Plaintiff was neurologically intact and had minimal back pain on range of motion ("ROM") testing. *Id.* He stated Plaintiff was "[n]ot capable

---

[1] Dr. Weigle advised Plaintiff to avoid use of Gabapentin while working because of its effect on his thinking ability. Tr. at 409.

of performing police duties." *Id.* He indicated Plaintiff had returned to work before his spine had fused, which had slowed his healing process and exacerbated his pain level. *Id.* He stated Plaintiff was incapable of returning to full time work in any capacity, including on light, limited, or restricted duty. *Id.*

Plaintiff complained of pain with repetitive activity on February 20, 2013. Tr. at 266. Dr. Olsewski observed Plaintiff to be neurologically intact and to demonstrate minimal back pain on ROM testing of his lumbar spine. *Id.* He stated Plaintiff was "[n]ot capable of performing these duties" and "would also be subject to increased back pain with repetitive motion, even with light weights." *Id.*

Plaintiff presented to Jose Corvalan, M.D. ("Dr. Corvalan"), for an orthopedic examination on May 31, 2013. Tr. at 299–301. He reported he had continued to experienced pain since his surgery. Tr. at 299. He stated his pain was aggravated by sitting, standing, walking, bending, climbing stairs, lifting, and carrying heavy objects. *Id.* Dr. Corvalan described Plaintiff as favoring his right side while ambulating. Tr. at 300. He indicated Plaintiff was unable to walk on his heels or toes; could squat to 50 degrees; had normal station; used no assistive device; needed no help getting on or off the exam table; and was able to rise from a chair without difficulty. *Id.* He described Plaintiff as having reduced ROM of his lumbar spine to 40 degrees of flexion, 40 degrees of extension, 20 degrees of lateral flexion, and 20 degrees of lumbosacral rotation. *Id.* He noted Plaintiff was tender to palpation of the lumbar spine and had a positive SLR test at 20 degrees on the right and 30 degrees on the left in the sitting and supine positions. *Id.* He indicated Plaintiff had reduced ROM of his bilateral hips and knees, but full ROM of

his bilateral ankles and normal strength, reflexes, and sensation. Tr. at 301. He diagnosed low back pain radiating to the bilateral lower extremities that was more severe on the right than the left. *Id.* Dr. Corvalan stated Plaintiff "has marked limitation sitting and standing for long period[s] of time, walking long distance, bending, squatting, climbing stairs, lifting, or carrying heavy objects." *Id.*

Plaintiff reported doing well on June 5, 2013, but indicated his back continued to bother him with repetitive activity. Tr. at 308. Dr. Olsewski described Plaintiff as being neurologically intact and having minimal back pain on ROM testing of the lumbar spine. *Id.* He stated Plaintiff was not capable of performing police duties and would "be subject to increased back pain with repetitive motion, even with light weights." *Id.*

On June 6, 2013, state agency consultant C. Pipino reviewed Plaintiff's records and assessed his physical residual functional capacity ("RFC"). Tr. at 69–71. He indicated Plaintiff's RFC was as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of two hours in an eight-hour day; sit for a total of about six hours in an eight-hour day; never stoop, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds; and occasionally balance and kneel. *Id.*

On November 27, 2013, Dr. Olsewski noted that Plaintiff continued to complain of pain in his back and leg. Tr. at 307.  He indicated Plaintiff was neurologically intact, aside from a left-sided facial droop caused by Bell's palsy. *Id.* He instructed Plaintiff to follow up in three months. *Id.*

On January 15, 2014, Dr. Olsewski noted Plaintiff was "doing reasonably well," but would have significant limitations on bending and twisting and would be limited to lifting five pounds. Tr. at 306. He completed a patient functional assessment check-off form. Tr. at 427–28.

On April 16, 2014, Dr. Olsewski indicated Plaintiff had "continued with the same level of constant pain." Tr. at 423. He stated Plaintiff would have "lifetime significant limitations on bending, twisting, and a 5 pound weight lifting limit." *Id.*

b.     Evidence Presented to Appeals Council

On December 31, 2012, Dr. Weigle completed a disability benefits questionnaire for the Department of Veterans Affairs. Tr. at 449–54. He indicated Plaintiff's diagnoses included L5 spondylosis, L5 herniated disc, chronic low back pain, and lumbar radiculopathy. Tr. at 449. He assessed Plaintiff as having 50 degrees of forward flexion; 15 degrees of extension; 25 degrees of right lateral flexion; 25 degrees of left lateral flexion; 15 degrees of right lateral rotation; and 15 degrees of left lateral rotation.[2] Tr. at 449–50. Dr. Weigle noted Plaintiff was unable to perform repetitive-use testing because of pain. Tr. at 450. He indicated Plaintiff had less movement than normal, excess fatigability, and pain on movement. *Id.* He assessed Plaintiff as having 3/5 strength with bilateral hip flexion, 4/5 strength with left knee extension, and 5/5 strength with right knee extension, bilateral ankle plantar flexion, bilateral ankle dorsiflexion, and bilateral great toe extension. Tr. at 451. He indicated Plaintiff had hypoactive DTRs in his

---

[2] According to the form, the normal ROM endpoint for forward flexion is 90 degrees and 30 degrees is the normal ROM endpoint for all other measures. Tr. at 449–50.

bilateral knees and ankles. *Id.* He stated Plaintiff had normal sensation to light touch, except in his left lower leg/ankle and foot/toes. Tr. at 452. He noted that the SLR test was negative bilaterally. *Id.* Dr. Weigle denied that Plaintiff had constant pain in his lower extremities. *Id.* He indicated Plaintiff had mild intermittent pain in his bilateral lower extremities and moderate paresthesias, dysesthesias, and numbness in his left lower extremity. *Id.* He noted that Plaintiff's bilateral L4, L5, S1, S2, and S3 nerve roots were involved. *Id.* He stated that Plaintiff had experienced at least six weeks of incapacitating episodes over the prior 12-month period. Tr. at 453. He indicated Plaintiff occasionally used a cane. *Id.* He cited MRIs of Plaintiff's lumbar spine in May 2010 and June 2011 and EMG results from 2011 and 2012. Tr. at 454. He stated Plaintiff "cannot sit or stand, especially sitting 10 minutes makes pain severe, standing painful after 15 min." *Id.*

Plaintiff presented to Allan Brook, M.D. ("Dr. Brook"), for a consultation on March 8, 2013. Tr. at 429. Dr. Brook reviewed Plaintiff's x-ray films from June 29, 2011, and stated that he agreed with Dr. Olsewski's assessment of spondylolisthesis. *Id.*

Plaintiff followed up with Dr. Weigle on June 18, 2014. Tr. at 431. He complained of back pain that radiated into his left more than his right lower extremity with burning dysesthesias. *Id.* He rated his pain as a nine on a 10-point scale and stated he was unable to sit or stand for any length of time. *Id.* Dr. Weigle observed Plaintiff to have symmetric reflexes in the lower extremities, but diminished sensation to pinprick in the L4 and S1 distribution in his left lower extremity and along the dorsum of his right foot. Tr. at 432. He indicated Plaintiff had normal muscle bulk with slight weakness limited by pain in his left lower extremity and very limited lumbar ROM. *Id.* He assessed left L4 and S1 and

bilateral L5 radiculopathy with abundant denervation potentials and polyphasic motor units, but no polyneuropathy. *Id.*; Tr. at 436–37. He indicated Plaintiff had severe deficits in mobility and activities of daily living ("ADLs") and stated "[p]atient cannot tolerate any work including sedentary work because he cannot sit or stand for any period of time." *Id.* He recommended a spinal cord stimulator for pain management. *Id.*

On June 25, 2014, Dr. Weigle noted that Plaintiff had a severe exacerbation of his back pain; radicular pain that was worse in his left lower extremity; severe numbness and tingling in his left lower extremity; moderate tingling and mild numbness in his right lower extremity; a feeling of heaviness; and intermittent problems with standing and ambulating. Tr. at 433. He observed Plaintiff to have normal muscle bulk, but diminished strength of 3+–4/5 in his left hip girdle, 3+–4/5 in his left knee extensors, and 4/5 in his left knee flexors. Tr. at 434. Plaintiff had 3+–4/5 dorsiflexion and eversion on the left. *Id.* He had mild weakness of 4/5 in his right hip girdle, but his strength was otherwise 5/5 on the right. *Id.* He had diminished sensation to pinprick and light temperature in his left L4 to S1 dermatomes. *Id.* He had reduced sensation in the lateral aspect of his distal right foot. *Id.* He had depressed reflexes to left ankle jerk. *Id.* He had a severe muscle spasm in his back that resulted in "essentially no range of motion in his lumbar spine." *Id.* Dr. Weigle assessed "[s]evere disability." *Id.* He noted Plaintiff "[b]etter tolerated forward flexion during non-flare up periods," but had "severe incapacity and ina[b]ility to do even sedentary work with flare ups occurring so frequently." *Id.*

Dr. Weigle also completed a form titled "Back (Thoracolumbar Spine) Conditions Disability Benefits Questionnaire for the Department of Veterans Affairs on June 24,

2014. Tr. at 438–48. He indicated Plaintiff's conditions included degenerative disc disease at L4-5 and L5-S1, polyradiculopathy on the left at L4-5 and on the right at L5, and a history of lumbar stenosis status post-fusion. Tr. at 438. He checked boxes to indicate Plaintiff was diagnosed with degenerative disc disease, foraminal/lateral recess/central stenosis, intervertebral disc syndrome, and radiculopathy in July 2011. *Id.* He stated Plaintiff was "unable to sit, stand, walk due to crippling pain" in his "[b]ack & L>R LEGS." Tr. at 439. He assessed Plaintiff's ROM as follows: 30 degrees of forward flexion; 10 degrees of extension; 10 degrees of right lateral flexion, 20 degrees of left lateral flexion; 10 degrees of right lateral rotation; and 10 degrees of left lateral rotation. *Id.* He indicated Plaintiff was unable to perform repetitive-use testing because of severe pain and muscle spasms. Tr. at 440. He described Plaintiff as having abnormal gait. Tr. at 441. He stated Plaintiff had the following contributing factors of disability: less movement than normal; weakened movement; excess fatigability; pain on movement; interference with sitting; and interference with standing. Tr. at 441. He indicated Plaintiff would need to "lay supine in severe flare ups." Tr. at 442. He described Plaintiff as having 4+/5 right hip flexion, but indicated his muscle strength was otherwise normal in his right lower extremity. *Id.* He stated Plaintiff had 3+/5 left knee flexion and left great toe extension; 4+/5 left knee extension and left foot abduction and adduction; 4/5 left hip flexion and left ankle dorsiflexion; and 5/5 left ankle plantar flexion. Tr. at 443. He stated Plaintiff did not have muscle atrophy. *Id.* He described Plaintiff's DTRs as normal in his right ankle; reduced in his left ankle; and normal-to-hyperactive without clonus in his bilateral knees. *Id.* He noted Plaintiff had decreased sensation to light touch in his left

lower leg/ankle and foot/toes. Tr. at 444. SLR tests were positive on the right and the left. *Id.* Dr. Weigle indicated Plaintiff had constant pain that was moderate in his right lower extremity and severe in his left lower extremity. *Id.* He stated Plaintiff had paresthesias and/or dysesthesias that were moderate in his right lower extremity and severe in his left lower extremity. Tr. at 445. He described Plaintiff as having mild numbness in his right lower extremity and severe numbness in his left lower extremity. *Id.* He stated Plaintiff had moderate radiculopathy in his right lower extremity and severe radiculopathy in his left lower extremity. *Id.* He indicated Plaintiff's left L2, L3, L4, L5, S1, S2, and S3 nerve roots were involved and that his right L4, L5, S1, S2, and S3 nerve roots were involved. *Id.* He stated Plaintiff had experienced at least six weeks of incapacitating episodes over the past 12 months. *Id.* He indicated EMG results showed polyradiculopathy on the left at L4-5 and on the right at L5 in August 2011, September 2012, and June 2014. Tr. at 447. He stated Plaintiff was unable to sit, stand, or ambulate for "periods of time" and could not perform sedentary work. *Id.*

  C.  The Administrative Proceedings

    1.  The Administrative Hearing

      a.  Plaintiff's Testimony

        i.  February 20, 2014

At the hearing on February 20, 2014, Plaintiff testified he was limited by shooting pain that extended down his back, into his buttocks, and through his bilateral legs. Tr. at 32 and 33. He stated his left leg was weaker than his right because of nerve damage. Tr.

at 33. He reported numbness and tingling in his foot and toes. *Id.* He indicated he experienced muscle spasms in his back. Tr. at 35.

Plaintiff testified he worked as a patrol officer for the police department for 12 years. Tr. at 35. He confirmed that he received disability-based retirement. Tr. at 31.

Plaintiff testified he had difficulty sitting and estimated he could sit for 20 minutes. Tr. at 38. He stated he could stand for a maximum of 20 minutes and could walk for half a block to a block. Tr. at 41. He indicated that lying down was the most comfortable position for him. Tr. at 39, 41. He stated he used a heating pad and a TENS unit to reduce his pain. Tr. at 39. He reported he drove short distances on his own, but sometimes relied on his wife to drive him to appointments. Tr. at 39.

### ii.    May 7, 2014

Plaintiff appeared and testified at a supplemental hearing on May 7, 2014. Tr. at 46. He denied any change in his condition since the February hearing. Tr. at 48.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Linda Stein reviewed the record and testified at the hearing. Tr. at 48. The VE categorized Plaintiff's PRW as a police officer, I, *Dictionary of Occupational Titles* ("*DOT*") number 375.260-014, as having a medium exertional level and a specific vocational preparation ("SVP") of six and a merchant patroller/security guard, *DOT* number 372.667-038, as having a light exertional level and an SVP of three. Tr. at 49. The ALJ asked the VE to identify transferable skills from Plaintiff's PRW. Tr. at 50. The VE indicated Plaintiff had investigative skills, telephone etiquette and skills, communication skills, report writing skills, and customer service

skills. Tr. at 51. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to lifting and carrying five pounds; could perform sedentary work; could perform reaching, handling, bending, and twisting for 50 percent of a typical workday; and was unable to engage in overhead reaching. *Id.* The VE testified that the hypothetical individual could perform sedentary work with an SVP of three as a police aide, *DOT* number 243.362-014, with 23,377 positions in the national economy; sedentary work with an SVP of four as an information clerk, *DOT* number 237.367-022, with 146,983 positions in the national economy; and sedentary work with an SVP of six as a police clerk, *DOT* number 375.362-010, with 23,377 position in the national economy. Tr. at 51–53.

Plaintiff's attorney asked the VE to consider a hypothetical individual with the same vocational profile and limitations indicated in the first question, but to further assume the individual would be off task for more than 10% of the workday. Tr. at 54. The VE responded that being off task for 10% of the workday may be acceptable in all of the identified jobs if the individual were off task for six minutes per hour, but it would not be acceptable in the jobs of police clerk and police aide if the individual were off task for 10% of the workday on an unscheduled basis. *Id.*

Plaintiff's attorney next asked the VE to consider a hypothetical individual with the same vocational profile and limitations identified earlier, but to further assume the individual would require three or more sick days per month. Tr. at 55. He asked if the individual would still be capable of performing the jobs identified in response to the

earlier question. *Id.* The VE responded that the individual would likely exceed the number of allowable sick days each year. Tr. at 56.

Plaintiff's attorney asked the VE to indicate what percentage of the day an individual could be off task before it would be problematic to the position of information clerk. Tr. at 56. The VE stated it would likely be job specific, but estimated that it would generally be problematic if an individual were off task for more than 15% of a workday. *Id.*

Plaintiff's attorney asked the VE to assume the hypothetical individual would be limited to less than one hour of walking or standing and less than two hours of sitting during an eight-hour day. Tr. at 57. The VE stated the individual would be incapable of performing sedentary work. *Id.*

2.    The ALJ's Findings

In his decision dated June 17, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
2.    The claimant has not engaged in substantial gainful activity since February 6, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.    The claimant has a severe spinal impairment.
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant is able to sit for a total of eight hours and stand and or walk for a total of four hours during the course of an 8-hour workday. The claimant can lift/carry objects weighing a maximum of 5 pounds. The claimant is able to frequently (i.e., 50% of the time) bend, stoop and twist.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January 25, 1964 and was 49 years old as of the alleged onset date, which classified him as a younger individual, age 45–49 on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age as of January 25, 2014 (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 6, 2013 through the date of this decision (20 CFR 404.1520(g)).

Tr. at 16–22.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ improperly rejected the opinion of Plaintiff's treating neurosurgeon;

2) the ALJ did not consider that another agency had approved Plaintiff for disability retirement benefits; and

3) the Appeals Council neglected to sufficiently weigh new evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

_____

[3]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

23

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Dr. Olsewski's Opinion

On January 15, 2014, Dr. Olsewski completed a functional assessment form in which he stated Plaintiff could stand and/or walk for less than one hour during an eight-hour workday; could sit for less than two hours during an eight-hour workday; could lift and/or carry less than five pounds for up to one-third of an eight-hour workday; and could lift and/or carry less than three pounds for up to two-thirds of an eight hour workday. Tr. at 427. He indicated Plaintiff required "frequent breaks of 15 minutes or more each during the work day"; "suffers with pain which prevents patient from performing 8 hours of work"; "requires medications that interfere with his/her ability to function in the work setting"; "would have difficulty concentrating, and would be off task more than 10% of the work day"; and "requires an average of 3 or more sick days off per month." Tr. at 428. He stated his diagnostic and clinical findings were supported by x-ray and MRI results and his attached notes and operative report. *Id.*

Plaintiff argues the ALJ improperly rejected the work-preclusive limitations specified by Dr. Olsewski. [ECF No. 15 at 17]. He maintains the ALJ failed to identify Dr. Olsewski as an orthopedic specialist. *Id.* at 20. He contends the ALJ impermissibly and erroneously interpreted the diagnostic evidence. *Id.* at 21. He maintains the ALJ considered Dr. Olsewski's notations of his improvement out of context in using them to

24

discount the opinion. *Id.* at 23–25. He contends the ALJ failed to identify inconsistencies between Dr. Olsewski's treatment notes and his opinion. *Id.* at 25–26.

The Commissioner argues the ALJ considered Dr. Olsewski's opinion in accordance with the relevant rulings and regulations. [ECF No. 16 at 11]. She maintains the ALJ properly credited Dr. Olsewski's specialization as a surgeon. *Id.* She contends the ALJ discounted Dr. Olsewski's opinion because it was not accompanied by an explanation and was inconsistent with his treatment notes. *Id.* at 13. She also argues that Dr. Olsewski's opinion was contradicted by Plaintiff's ADLs and the fact that he returned to work as a police officer. *Id.* at 14. She maintains that the ALJ did not merely cite Dr. Olsewski's indications that Plaintiff was doing well, but the clinical findings that supported that assessment. *Id.* at 14–17.

If a treating physician provides a medical opinion, that opinion is entitled to deference and may be entitled to controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. *Morgan v. Barnhart*, 142 F. App'x 716, 727 (4th Cir. 2005); 20 C.F.R. § 404.1527(c)(2). The notice of decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or

is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

If the ALJ does not accord controlling weight to a treating physician's opinion, he must weigh all medical opinions of record based on (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and the frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

Pursuant to 20 C.F.R. § 404.1527(c)(3), ALJs should give more weight to medical opinions that are adequately explained by the medical providers and supported by medical signs and laboratory findings than to unsupported and unexplained opinions. "The medical source opinion regulations indicate that the more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004);

*see also* 20 C.F.R. § 404.1527(c)(4).[5] In addition, ALJ's are directed to give greater weight to opinions from specialists who address medical issues related to their areas of specialty than to opinions from physicians regarding conditions outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5). ALJs should also consider any additional factors that tend to support or refute medical opinions in the record. 20 C.F.R. § 404.1527(c)(6).

It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ noted as follows:

> As directly relevant to this case, the medical records from the claimant's treating physician (Dr. John M. Olsewski) dated February 20, 2013 through April 16, 2014 note reports by the claimant of having consistent back pain when doing repetitive work. On physical examinations, though, Dr. Olsewski found only minimal back pain on range of motion of the claimant's lumbar spine with intact neurological functions. Dr. Olsewski reported that the claimant was doing well neurologically as time went on from his earlier surgery (Exhibit B2F at 7–8 and B8F). The medical record shows gradual improvement in symptoms of back pain.

Tr. at 18–19. He acknowledged that "[i]n the usual case, the administrative law judge should give greater weight to the opinions of a treating physician," but stated "the underlying basis for this particular opinion does not sustain the validity thereof." Tr. at 20. He found that the validity of Dr. Olsewski's opinion was reduced by the fact that it

---

[5] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

"was submitted in 'check off' format whereby the physician merely checked off items on a form without providing any explanation as to the basis for the opinion given." *Id.* He stated Dr. Olsewski's indication that the June 20, 2011 MRI showed a herniated disc was inconsistent with the MRI results. *Id.* He stated post-surgical radiographs showed excellent alignment, good lordosis, and medical improvement. *Id.* He noted that Plaintiff reported having returned to his duties as a police officer in January 2012. *Id.* He indicated Dr. Olsewski stated Plaintiff should be considered 100% disabled from his job as a police officer in July 2012, but did not preclude Plaintiff from other work activity. *Id.* He stated Dr. Olsewski's treatment notes did not suggest Plaintiff was unable to perform sedentary activities. *Id.* He observed that Dr. Olsewski observed Plaintiff to be "doing well neurologically" and to have minimal back pain on ROM testing in December 2012 and noted that Plaintiff only complained of back pain with repetitive activity in February 2013. *Id.* He noted that Plaintiff was able to perform duties as a police officer until 2013 and that the medical record showed "no 'sudden' adverse change in his medical condition as of February 2013" and actually showed "'medical improvement' at that time. *Id.* He stated the medical records did not support Plaintiff's allegations of "'homebound' status due to physical debilitation." *Id.*

The ALJ stated Dr. Olsewski's April 14, 2014 treatment note indicated Plaintiff was experiencing "the same level of constant pain" and had "lifetime 'significant limitations on bending, twisting, and a 5 pound weight limit,'" but that these limitations did not preclude Plaintiff from performing sedentary work. *Id.* He acknowledged that the ALJ had not defined "significant," but interpreted the term to mean that Plaintiff was

unable to bend, twist, stand, or walk for more than 50 percent of the workday. Tr. at 20–21. He stated "[t]here is no documented limitation for 'sitting.'" Tr. at 21. Thus, he determined the "check off" assessment was inconsistent with Dr. Olsewski's treatment notes and purported to give greater evidentiary weight to the treatment notes. *Id.*

The ALJ acknowledged the treatment relationship and provided a lengthy explanation for his conclusion that Dr. Olsewski's opinion was unsupported by his treatment notes. The record supports the ALJ's conclusion that Dr. Olsewski's notes indicated Plaintiff to be neurologically intact and to have minimal back pain on ROM testing and that x-rays showed his fusion to be consolidating. *See* Tr. at 266, 267, 284, 287, 307, and 308. Therefore, it was not unreasonable for the ALJ to find that Dr. Olsewski's opinion was inconsistent with some of the evidence and not entitled to controlling weight. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

Although the ALJ cited sufficient evidence to overcome the presumption that Dr. Olsewski's opinion carried controlling weight, he did not adequately evaluate the opinion based on all the relevant factors in 20 C.F.R. § 404.1527(c). While the ALJ cited some of Dr. Olsewski's post-surgical observations, his decision does not show that he considered Dr. Olsewski's medical specialty as an orthopedic surgeon in evaluating the opinion.[6] The ALJ also failed to consider the consistency between Dr. Olsewski's opinion and the other evidence of record. Before he considered Dr. Olsewski's opinion, the ALJ considered Dr. Corvalan's opinion that Plaintiff "would be markedly limited from sitting

---

[6] The Commissioner argues that the ALJ credited Dr. Olsewski's specialization as a surgeon, but the undersigned's review of the ALJ's decision yields no reference to Dr. Olsewski as having performed Plaintiff's surgery or being an orthopedic surgeon.

and standing for 'long' periods, walking 'long' distances, climbing stairs, bending, and squatting." Tr. at 19–20. He neglected to note the similarities between the limitations assessed by Dr. Corvalan and those assessed by Dr. Olsewski. *See id.* He also failed to consider the consistency between Dr. Olsewski's opinion and the abnormal findings and functional limitations endorsed by Dr. Weigle. *Compare id.*, *with* Tr. at 409 (observing forward flexion limited to 30 degrees, extension limited to 15–20 degrees, tenderness in the bilateral lumbar paraspinal musculature, pain with internal rotation of the hips, positive SLR test on the left, decreased sensation in the L5 and S1 distribution on the dorsum of the bilateral feet and in the lateral aspect of the calf, and deficits in mobility and recommending Plaintiff stop work because of his inability to tolerate prolonged sitting or ambulation), 417 (noting diminished sensation below the knee on the left side and in the right anterior thigh, difficulty with lumbar ROM, palpable spasms in the upper to mid-lumbar paraspinals, and limited ROM with 15–20 degrees of extension and 60–70 degrees of flexion), and 418 (opining that Plaintiff may be unable to tolerate limited or restricted duty as a police officer).

Furthermore, the ALJ's explanation for his decision to invalidate Dr. Olsewski's opinion is unsupported insomuch that it is based on an inaccurate assessment of some of the evidence. Dr. Olsewski specified that his opinion was supported by the MRI results, the operative report, his treatment notes, and the x-rays. *See* Tr. at 428. The ALJ erroneously stated the June 20, 2011 MRI of Plaintiff's lumbar spine did not show a disc herniation (Tr. at 20), when, in fact, the MRI report showed "small posterior herniation[s] impinging on the anterior thecal sac" at L4-5 and L5-S1 (Tr. at 271). The ALJ also stated

30

Dr. Olsewski indicated in July 2012 that Plaintiff should be considered 100% disabled from his job as a police officer, but did not suggest Plaintiff was precluded from performing other work. Tr. at 20. However, a review of Dr. Olsewski's July 2012 opinion reveals that he specified Plaintiff was "incapable of returning to police officer duties of any capacity, including light, limited, or restricted duty." Tr. at 269. This is particularly relevant in light of the ALJ's finding that Plaintiff could perform work as a police aide and a police clerk. *See* Tr. at 22.

Thus, it appears the ALJ did not adequately consider the entire record and the relevant factors in assessing Dr. Olsewski's opinion. Based on these errors, the undersigned recommends the court find the ALJ failed to provide good reason for his decision to invalidate the treating physician's opinion.

### 2.    Disability Retirement Decision

The record contains a letter July 22, 2013 letter that informed Plaintiff of his approval for Accidental Disability Retirement. Tr. at 332. The letter from the New York City Police Pension Fund's ("Police Pension Fund's") Board of Trustees explained to Plaintiff that he was approved for the benefits during their June 18, 2013 meeting, but it did not detail the reasons for the Board of Trustees' finding. *Id.* Nevertheless, the record contains a memorandum from the Police Pension Fund's Medical Board to the Board of Trustees dated August 28, 2012, that detailed Plaintiff's medical history and unanimously recommended he be approved for disability retirement benefits. Tr. at 333–39.

Plaintiff argues the ALJ erred in failing to consider and comment on the Police Pension Fund's finding that he was disabled. [ECF No. 15 at 28–29]. The Commissioner

argues that Plaintiff cannot show that the ALJ's error altered his decision because Plaintiff was granted disability retirement from the police force and the ALJ found he was no longer able to perform his PRW as a police officer. [ECF No. 16 at 18].

Pursuant to SSR 06-3p, ALJs cannot ignore and must consider disability decisions rendered by other agencies. However, the SSA is not bound by the disability determinations of other agencies. 20 C.F.R. § 404.1504.

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rule and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency (e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company) that you are disabled or blind is not binding on us.

*Id.* After examining the other agency's decision and the evidence it relied upon to support its conclusion, the ALJ should determine if the same finding is supported under the SSA's rules and regulations. *See* 20 C.F.R. § 404.1512(b)(5); *see also* SSR 06-3p. "[T]he adjudicator should explain the consideration given" to the decisions of other agencies in the notice of decision. SSR 06-3p.

The undersigned recommends the court find the ALJ failed to comply with the provisions of 20 C.F.R. § 404.1512(b)(5) and SSR 06-3p. The ALJ failed to acknowledge in his decision that Plaintiff was approved for retirement benefits based on a determination that he was disabled. He instead indicated that Plaintiff "apparently retired from the police force" in "calendar year 2013." Tr. at 20. The ALJ's characterization of Plaintiff's retirement is misleading to the extent that the record shows that Plaintiff was required to return to work against medical advice and struggled to perform his job duties

until the Police Pension Fund approved him for disability-based retirement. *See* Tr. at 269, 270, 275, and 408.

The undersigned has considered and rejects Plaintiff's argument that the ALJ's failure to consider the Police Pension Fund's decision was harmless error. This court has traditionally excused errors as harmless in cases where the ALJ "would have reached the same result notwithstanding" the error. *See Mickles v. Shalala*, 29 F. 3d 918, 921 (4th Cir. 1994); *see also Plowden v. Colvin*, 1:12-2588, 2014 WL 37217, at *4 (D.S.C. Jan. 6, 2014) (noting that the Fourth Circuit has applied the harmless error analysis in the context of Social Security disability determinations). The ALJ's determination that Plaintiff was unable to perform his PRW as a police officer was consistent with the Medical Board's recommendation that his application for disability retirement benefits be approved because there were "significant orthopedic findings precluding the officer from performing the full duties of a New York City Police Officer." Tr. at 338. However, pursuant to 20 C.F.R. § 404.1512(b)(5) and SSR 06-3p, the ALJ must consider the evidence the organization relied on in making its determination. The Medical Board's memorandum included a summary of Plaintiff's treatment history that cited some records that were relevant to the time period, but were not included in the record before the ALJ. *See* Tr. at 333–38. Among the evidence referenced in the Medical Board's decision, but not included in the record before the ALJ, were impressions from Plaintiff's treating physicians of significant functional limitations. *See* Tr. at 335 (noting Dr. Weigle's July 6, 2011 impression that Plaintiff had deficits in mobility and difficulty sitting or standing for prolonged periods) and 337 (citing a July 23, 2012 letter from Plaintiff's primary care

physician Ira Sutton, M.D., who stated Plaintiff was unable to wear a gun belt, remain seated for more than 10 minutes, or remain standing for 10 minutes). The Medical Board's decision reflects that Plaintiff worked on restricted duty beginning in July 2011. *See* Tr. at 335. It contains a summary of a physical examination performed contemporaneously with the Medical Board's August 28, 2012 decision that showed Plaintiff to have significant deficits. *See* Tr. at 338. In light of this evidence, which could have reasonably induced the ALJ to reach a different conclusion, the undersigned recommends the court find it was not harmless error for the ALJ to fail to consider the findings of the Police Pension Fund Board of Trustees and Medical Board.

### 3. New Evidence

Plaintiff argues the Appeals Council erred in declining to remand the case to the ALJ for consideration of the new evidence. [ECF No. 15 at 29]. He maintains the new evidence could have reasonably affected the ALJ's decision. *Id.* at 30–31. He specifically contends that the opinion evidence submitted to the Appeals Council was consistent with Dr. Olsewski's opinion. *Id.* at 32.

The Commissioner argues Plaintiff has not shown why the evidence submitted to the Appeals Council provided a basis for changing the ALJ's decision. [ECF No. 16 at 19]. She contends Dr. Weigle's opinions are not adequately supported. *Id.* She maintains the court should not remand the case for reconsideration of the evidence. *Id.* at 20.

A claimant may submit additional evidence that was not before the ALJ at the time of the hearing, along with a request for review of the ALJ's decision. *Meyer v. Astrue,* 662 F.3d 700, 705 (4th Cir. 2011), citing 20 C.F.R. § 404.967. However, the evidence

must be both "new" and "material" and the Appeals Council may only consider the additional evidence "where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). If new and material evidence is offered and it pertains to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. *Id.* After reviewing the new and material evidence and all other evidence of record, the Appeals Council will either issue its own decision or remand the claim to the ALJ if it concludes that the ALJ's "action, findings, or conclusion" was "contrary to the weight of the evidence." *Meyer*, 662 F.3d at 705, citing 20 C.F.R. § 404.970(b). However, if after considering all the evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were supported by the weight of the evidence, the Appeals Council will deny review and is not obligated to explain its rationale. *Id.* at 705–06.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the ALJ's decision to deny benefits where "substantial evidence support[ed] the ALJ's findings." *Id.*, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows the new evidence supported Plaintiff's claim and was not refuted by other evidence of record, the court should reverse

the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Secretary, Department of Health and Human Services*, 953 F.3d 93, 96 (4th Cir. 1991). If the addition of the new evidence to the record does not allow the court to determine whether substantial evidence supported the ALJ's denial of benefits, the court should remand the case for further fact finding. *Id.*

The Appeals Council indicated it considered the reasons Plaintiff disagreed with the ALJ's decision and the additional evidence that was submitted. Tr. at 2. It stated it admitted evidence from Dr. Olsewski dated March 8, 2013[7]; records from Dr. Weigle dated June 26, 2014, through June 30, 2014[8]; and a record from the Department of Veterans Affairs dated December 31, 2012.[9] Tr. at 4. It determined the additional evidence did not provide a basis for changing the ALJ's decision. Tr. at 2.

The evidence Plaintiff submitted to the Appeals Council included an assessment from Dr. Brook that supported Dr. Olsewski's diagnosis and findings and opinions from Dr. Weigle that reflected significant abnormalities and functional limitations. It appears to provide significant support for Plaintiff's disability claim and to be consistent with Dr. Olsewski's opinion. In light of the probative nature of this evidence, it should have been considered by the finder of fact in evaluating Dr. Olsewski's opinion and assessing the

---

[7] Although the Appeals Council cited a record from Dr. Olsewski dated March 8, 2013, it appears that it actually admitted into evidence the consultation note from Dr. Brook, but interpreted it as being from Dr. Olsewski because it states Plaintiff was referred by "JOHN M. OLSEWSKI, MD in consultation." *See* Tr. at 429.

[8] While the notes were dictated on June 26 and 30, 2014, they actually reference treatment visits on June 18 and 25, 2014. *See* Tr. at 431–34.

[9] This appears to be the opinion form completed by Dr. Weigle on December 31, 2012. *See* Tr. at 449–54.

evidence as a whole. Therefore, the undersigned recommends the court find that the Appeals Council erred in failing to either remand the case to the ALJ for its consideration or to issue a new decision that considered the evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

November 14, 2016                                Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).